BRETT L. TOLMAN, United States Attorney (#8821)
TRINA A. HIGGINS, Assistant United States Attorney (#7349)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

_____

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION
_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:07 CR 345 DB |
| Plaintiff, | : | UNITED STATES' |
| | : | MEMORANDUM IN OPPOSITION |
| vs. | : | OF DEFENDANT'S MOTION TO |
| | : | SUPPRESS DEFENDANT'S |
| HARRISON BEGAYE, | : | STATEMENTS |
| Defendant. | : | JUDGE DEE BENSON |

The United States Attorney, by and through the undersigned Assistant United States Attorney, hereby responds to the defendant's Memorandum In Support of Motion to Suppress Defendant's statements.

The Court should not suppress the statements defendant made to Agent Larson on May 25, 2007 because the statements were made voluntarily and while defendant was not in custody. As to the second interview which occurred during the drive to Salt Lake City on May 30, 2007, the government does not intend to introduce those statements at trial during its case in chief.

## FACTS

On May 25, 2007, Special Agents Matt Larson and Rachel Boisselle of the Federal Bureau of Investigation went to the residence of defendant, Harrison Begaye ("Begaye") to interview him. (Transcript of Motion to Suppress Hearing (hereinafter "Tr.") at page 8). The Special Agents drove to the Begaye residence and knocked on the door. (Tr. 9). Rena Begaye ("Rena"), defendant's wife, answered the door and Begaye came up behind her shortly after. (Tr. 9). Agent Larson informed the couple that they were there in order to talk to them about the situation involving their children being removed from the house, and asked if they would be willing to talk about that. (Tr. 10). Agent Larson asked Begaye if he would talk to him, and Rena walked off with Agent Boisselle to speak near the horse corrals on the property. (Tr. 10). Rena and Boisselle were approximately 30 to 50 yards away from Larson and Begaye throughout the interview. (Tr. 11). There were no other people present at the residence that day. (Tr. 12).

Agent Larson and Begaye walked to a pickup truck that was parked in front of the doorway. He told Begaye that he had a recorder and that he wanted to record a statement with him. (Tr. 10). A complete copy of that recording has been submitted to the Court as Exhibit 1, and a transcript of that recording was submitted at the hearing as Exhibit 2. Agent Larson told Begaye specifically that he wanted to talk to him about the situation leading up to the children being removed. (Tr. 10). Larson told Begaye that he didn't have to talk to him if he didn't want to. (Tr. 10). Begaye said that he was willing to talk

about it. (Tr. 10). In all, the interview with Begaye lasted a little less than an hour. (Tr. 12). The interview occurred during daylight hours, near defendant's pickup truck, which was approximately 10 feet in front of the house. (Tr. 12).

Agent Larson started by talking about the injuries of the children and told Begaye that they had been forensically interviewed. (Tr. 26). He told Begaye that he needed an explanation for the injuries. (Tr. 27). Agent Larson first talked about evidence of welts on the children, and said that they had been whipped. (Tr. 27). Begaye admitted that he had used a horse whip on two of his male children. (Exhibit 2, page 7). He also admitted to disciplining one of his sons with a lead rope used for horses. (Exhibit 2, page 10). Agent Larson also asked Begaye about one of his son's being shot in the face with a b.b. gun. (Tr. 27). Begaye initially denied being present for that, but eventually admitted that he had been present, and that he had fired the shot, though he said it was an accident. (Tr. 28). Agent Larson also talked with Begaye about needle marks that had been found on the children's skin. (Tr. 28). The needle marks came from needles used for horses. (Tr. 28). Begaye initially denied having any involvement with that and said that maybe those marks were bug bites. Larson told him that the doctors could tell the difference between bug bites and needle marks, and that these were needle marks. (Tr. 29). Begaye later admitted that on one occasion, he did 'teasingly' poke his child Joseph with one of the horse needles. (Tr. 28).

Agent Larson then told Begaye that there was a problem with Jamesina, Begaye's

3

11-year-old daughter, and that she had been examined a couple of times. (Tr. 29). He also told Begaye that Jamesina had been sexually abused and that D.N.A. samples had been taken, in the form of semen, skin and pubic hair. (Tr. 29). In actuality, Jamesina had been examined once and it was determined that she had been sexually abused, but no D.N.A. samples were taken. (Tr. 29). Agent Larson then asked Begaye if he thought he would benefit from therapy or counseling. (Tr. 30). Begaye said he would, and then Larsen asked him how often sexual contact had happened between him and his daughter, Jamesina. (Tr. 31). After a long pause, Begaye admitted that he had had sexual intercourse with Jamesina on three occasions. (Tr. 32). Begaye said that he had had sex with her once a month for three months. (Tr. 32). Jamesina had told doctors that it had been going on longer than that, so Larsen continued speaking with Begaye about the frequency of the sexual contact. (Tr. 32).

Agent Larson maintained a conversational tone throughout the interview, and Begaye's tone and demeanor were the same. (Tr. 15). Begaye was not emotional or crying or shouting. (Tr. 15). Larson was wearing casual pants and a casual shirt, which was untucked. (Tr. 15). He also had a firearm on his body, but it was not visible to Begaye at any time. (Tr. 15). At no time during the interview did Larson make any threats of force, promises, or offers of any leniency for talking to him. (Tr. 15). There was never any yelling, swearing, or any physical contact between Larson and Begaye. (Tr. 15-16). Begaye was never physically restrained during the interview, but rather spent

the entire interview leaning against his own truck. (Tr. 16). Agent Larson never told Begaye at any time before or during the interview that he was going to be arrested or that he was required to stay there. (Tr. 16). Larson did not go to the residence with the intention of arresting Begaye. (Tr. 33). He didn't feel that he could have arrested him prior to the interview. (Tr. 33).

At the end of the interview Agent Larson spoke with Agent Boisselle about their respective interviews and the two parties. (Tr. 16). They also took photographs of the outside and inside of the home, and they collected some physical evidence, including a b.b. gun, a lead rope and a whip (Tr. 17-18, 35). Begaye described where some items were located, but remained by the truck while the agents undertook these further investigations. (Tr. 27). Larson and Boisselle spoke further at this point, and determined that Begaye should be arrested. (Tr. 18). The basis for that determination was that he had admitted to having sex with his 11-year-old daughter on multiple occasions, that the agents had found physical evidence to corroborate what the children had told them, and from the fact that sometimes when offenders are confronted with the fact that their crimes or alleged crimes are now public, they are at risk of suicide. (Tr. 18-19). This has happened before in a case on which Larsen was working. (Tr. 19).

Agent Boisselle made the final decision, as the case agent, to take Begaye into custody. He was handcuffed and taken to the San Juan County Jail (Tr. 19, 20). This arrest took place at approximately 4:20 in the afternoon, on a Friday. (Tr. 19). The

following Monday, May 28, 2007, was Memorial Day (Tr. 5), and an affidavit was written for a complaint charging Begaye on Tuesday, May 29, 2007. The next morning, Wednesday, May 30, 2007, Begaye was brought to Salt Lake City to appear before a magistrate judge. He was transported by Larson and Boisselle. (Tr. 20). They picked up Begaye just before 6:00 a.m., and it took them approximately four and a half hours to get to Salt Lake City. (Tr. 20). Larson advised Begaye of his rights based on Miranda after they had loaded him into the transport vehicle, while still in the parking lot of the San Juan County Jail. (Tr. 22). He did not state the *Miranda* warnings verbatim, but informed Begaye of his rights in a general way. (Tr. 23). He also told Begaye that he didn't have any more questions for him, but that if Begaye had any questions, he would try to answer them. (Tr. 23). Larson explained a little about what would happen, that they were taking him to a hearing, and that a defense attorney would be waiting for him there. (Tr. 23).

About three and half hours later, at about 9:30 a.m., Larson asked Begaye if he could ask him a question. (Tr. 24). Begaye indicated that that was fine, and Larson again asked him about the number of times he had had sex with Jamesina. (Tr. 36). Begaye again said that it had occurred three times, once per month for the last three months. (Tr. 37). Larson then asked Begaye if he had any other questions, and Begaye asked about an attorney and about the charges against him. (Tr. 37). Larson estimated that this conversation lasted ten minutes. (Tr. 24). They arrived in Salt Lake City at

approximately 10:30 a.m. (Tr. 36).

## ANALYSIS

### DEFENDANT WAS NOT IN CUSTODY DURING THE INTERVIEW AND HIS STATEMENTS WERE VOLUNTARY.

Defendant's statements to Agent Larson on May 25, 2007 should not be suppressed because they were voluntary and he was not in custody during the interview. *Miranda* warnings are only required during a custodial interview. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444, 1612. Thus, "[p]olice officers need not administer *Miranda* warnings to everyone they question." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008). "Whether a suspect is in custody represents an objective determination," and the court therefore "must determine whether a 'reasonable person in the suspect's position would have understood the situation as the functional equivalent of formal arrest.'" *Id*. (quoting *United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008).

Agent Larson was not required to give defendant his *Miranda* warnings because defendant was not in custody during the interview. "The determination of custody, from an examination of the totality of the circumstances, is necessarily fact intensive." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993). Courts look to several non-

7

exhaustive factors for guidance. *Jones*, 523 F.3d at 1240. They first consider "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* (quoting *Griffin*, 7 F.3d at 1518). Second, they look at the "nature of the questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* (quoting *Griffin*, 7 F.3d at 1518). Third, by using "the following helpful guideposts, [courts] check whether police dominate the encounter:" *Id.*

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled." *Id.* (quoting *Griffin*, 7 F.3d 1518-19).

Considering these three factors and the totality of the circumstances surrounding the interview, defendant was not in custody and his statements were voluntary.

   **A. Defendant was not in custody because he was made aware that he did not have to speak with Agent Larson if he did not want to and he chose to do so voluntarily.**

First, courts consider "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Jones*, 523 F.3d at 1240 (quoting *Griffin*, 7 F.3d at 1518).

Agent Larson told Begaye that he "didn't have to talk to me about it if he didn't want to." (Tr. at 10). Larson made this statement at the outset of the interview, before any questioning was underway. Larson also told Begaye that he wanted to question him

about his children. (Tr. at 10). Begaye acknowledged that he understood he did not have to talk and said that he was willing to talk. *Id.* the interview was voluntary, and he agreed to talk with Larson about the situation of the children being removed from the home. Begaye knew both what the specific subject matter of the interview would be and that he was free not to speak with Larson if he didn't want to. Being aware of both of these facts, he voluntarily agreed to speak with Agent Larson. Larson did not go to the residence with the intention of arresting Begaye, he did not think he had sufficient evidence before the interview to arrest Begaye and he never mentioned anything about arrest or the possibility of arrest either before or anytime during the interview. (Tr. at 33).

Defendant argues that the fact that Larson did not specifically tell Begaye that he was "free to leave" helps to demonstrate that Begaye was in custody at the time of the interview. There is no authority that states that these specific words must be used, and in any case, the interview took place outside of Begaye's home, in the open air, near his truck. This is far different from situations where suspects are questioned at a police station or within a police vehicle. In those situations, it is obviously more appropriate for law enforcement to inform suspects that they are free to leave if they are not in official custody. In this case, it would be odd for Larson to tell Begaye that he was "free to leave" his own home, and as they were not in an enclosed space, it would be odd for him to tell him he could "leave" in any sense. In any case, Begaye was made aware and knew that he did not have to speak with Larson if he didn't want to. (Tr. 10).

### B. Defendant was not in custody because the nature of the questioning was not prolonged and did not create a coercive environment from which the defendant would not feel free to leave.

Second, courts examine the "nature of the questioning," to determine whether there was "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Jones*, 523 F.3d at 1240 (quoting *Griffin*, 7 F.3d at 1518).

In all, the interview lasted less than an hour. (Tr. 12). The nature of the questioning was about whether defendant had abused his children but it was not prolonged or coercive. Agent Larson told Begaye that there were some problems with disciplining the children, and that "it looks like some of the physical discipline is probably a little too harsh." (Exhibit 2, page 5). He told Begaye that he "respected [his] role as a parent to discipline [his] kids the way [he thought] best." *Id.* And then continued to speak in terms of correcting the abusive disciplinary techniques. Agent Larson informed Begaye that he was "just trying to talk to [him] about what's going on." (Exhibit 2, pages 5-8). These statements illustrate that the questioning was not accusatory, and a reasonable person would not have understood it to be so.

While Larson did press Begaye on issues such as the welts the children had, the needles they had been poked with, the b.b. gun that one of the male children had been shot with, and the sexual activity with Jamesina, his tone was always conversational, never accusatory. (Tr. 15). Larson also repeated Begaye after he had told him that sexual

10

intercourse had occurred three times in the past three months, and said "is I said anything that's wrong, feel free to disagree with me." (Exhibit 2, page 30). He told Begaye that there was "nothing more important than [your family]," and that the Begaye's taking responsibility for the sexual acts with Jamesina showed him "that you (Begaye) . . . do love your family and you do want to see better things for them." (Exhibit 2, page 30). He also told Begaye that they were "working toward the future." (Id.). Each of these comments demonstrate that the interview was not coercive or overly accusatory. Agent Larson created an environment of mutual understanding and cooperation rather than one of coercion.

The nature of the questioning was not prolonged, accusatory, or likely to create a coercive environment from with the defendant would not feel free to leave. Because the nature of the questioning was calm and did not create a coercive environment, this was not a custodial interview.

### C. The defendant was not in custody because the atmosphere of the interview was not police-dominated.

Finally, the interview was not done in a police-dominated atmosphere. Courts analyze several factors in determining whether a suspect is in a police-dominated atmosphere. These include "separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance

with the request might be compelled." *Jones*, 523 F.3d at 1240 (quoting *Griffin*, 7 F.3d 1518-19).

Defendant was walked away from his wife for the interview so that she could be interviewed separately, however, the interview took place outside, and his wife was within 50 yards of him during the entire interview. (Tr. 11). While this is certainly not the same as having her by his side, it is also very different from a situation wherein a suspect has no contact with family members, either physical, visual, or emotional, and is cut off completely from family members.

The location of the interview was outside of the Begaye's own home near his truck. Defendant was not restrained in any way lends support to the argument that he was not in an environment where he would have felt threatened or cut-off from family members. (Tr. 16).

The other factors used in determining whether Begaye was interviewed in a police-dominated atmosphere all very clearly weigh in favor of finding that he was not in one. He was not isolated in a nonpublic questioning room, nor was he enclosed in a room of any kind in which he would feel coerced to answer the questions posed by Agent Larson. The interview did not even occur in a vehicle with closed doors, but outside the defendant's own house, as he was leaning on his own pickup truck. (Tr. 16).

There was no threatening presence of several officers. Larson was the only officer within earshot that heard what Begaye said, the only other officer in the area was agent

12

Rachel Boisselle who was talking to Rena Begaye 30-50 yards away. (Tr. 11). Agent Larson never displayed his firearm, and even though he was armed, he kept his firearm concealed at all times beneath his untucked shirt. (Tr. 15). Furthermore, the clothes he wore were casual, which would put the reasonable person even more at ease than if he had been wearing F.B.I. marked clothing or a uniform. (Tr. 15).

There was also no physical contact with the defendant at any time either before or after the interview. (Tr. 16). Begaye was never physically restrained during the interview. (Tr. 16). The only time physical contact was made was approximately 45 minutes after the interview had concluded, when Larson arrested the defendant and placed him in handcuffs. (Tr. 19).

While each of the above factors are clearly illustrative of the fact that the atmosphere was not police-dominated, the last factor courts examine is perhaps the most telling: the tone and language of Agent Larson were always conversational. (Tr. 15). Neither he nor Begaye ever became upset. (Tr. 15). There was no yelling during the interview. (Tr. 15). Neither of them ever swore. (Tr. 16). There is nothing in the record that shows that Larson ever acted or spoke in a manner implying that compliance with anything he said or answers to anything he asked might be compelled. And no threats or promises or leniency were made by Agent Larson. (Tr. 15). Near the beginning of the interview, Larson stated that "it looks like there's some problems going on at home that we need to get addressed somehow," and "I understand raising six kids . . . can't be easy."

13

He also stated that "there's gotta be some frustrations from time to time around here. . . . I have kids too so I understand that kids are not always doing what they should be doing in today's culture, you want to make sure that the kids are doing what they're supposed to be doing." (Exhibit 2, page 4). These statements demonstrate that Larson's tone was one of understanding, and not one of coercion or one that was threatening. His tone of voice and language remained constant throughout the interview.

An examination of each of these factors weighs in favor of finding that the atmosphere was not a police-dominated one. Defendant correctly points out in his Memorandum in Support of Motion to Suppress that the presence of a police-dominated atmosphere supports a finding that an interrogation is custodial. He relies on both *Orozco v. Texas*, 394 U.S. 324 (1969), and *United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987) to support his argument. These cases are easily distinguished from the instant case. In *Orozco*, the interrogation did indeed take place in the defendant's home, but police officers conceded that the defendant was not free to leave during the questioning, and that he was in fact already under arrest when the questioning took place. 394 U.S. at 325. In *Beraun-Panez*, even though the questioning took place in an open field, the Court found that the interview was still custodial, based on several factors, including that two police officers flanked the defendant, an illegal immigrant, and told him that he would be deported if he did not confess to committing the crime they were investigating. He was also promised favors if he confessed. 812 F.2d at 579. These cases are clearly very

different from the instant case, where defendant was not under arrest and was free to terminate the interview at any time, where there was only one officer present, and where Agent Larson made no promises or offers of any kind for cooperation.

Defendant also argues that the photographs of his demeanor during the interview show that he looks "beaten down, haggard . . . deflated. He does not look like someone who is having a voluntary conversation that he could terminate at any point, he looks like someone who is under police control and knows it." (Def. Mem. at 9). The actual demeanor of a suspect is not a factor which courts need consider in determining whether an environment is police-dominated under *Jones*. Even more important than this consideration, however, is that this characterization of the defendant is highly subjective at best, as well as being highly self-serving. It must be noted that the defendant was answering questions regarding physical and sexual abuse of his children, and that the level of this abuse was so extreme that law enforcement had become involved. The defendant admitted to whipping one of his children, poking one of them with syringes used for vaccination of horses, shooting one of his sons in the face with a b.b. gun (although allegedly by accident), and having sexual intercourse with his 11-year-old daughter on three occasions. Any person who had admitted such things would feel 'deflated,' regardless of whether police officers were present or not. Begaye admitted he knew that having sex with his daughter was wrong, and that he had even told her as much. It is a leap to claim that his 'beaten-down' demeanor was a result of his belief that

he was under police control, and had nothing to do with the fact that he had just confessed to sexually and physically abusing his children.

## CONCLUSION

The defendant was not in custody at the time of the interview because he spoke with Larson voluntarily when he knew he did not have to, the nature of the questioning was not prolonged or accusatory and it did not create a coercive environment from which the defendant would not feel free to leave, and the atmosphere was clearly not police-dominated. The Court should therefore deny Defendant's motion to suppress the statements he made to Larson during this interview.

DATED this 24th day of June, 2008.

>                             BRETT L. TOLMAN
>                             UNITED STATES ATTORNEY
>
>                             /s/ Trina A. Higgins
>                             TRINA A. HIGGINS
>                             Assistant United States Attorney