IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH – CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>HARRISON BEGAYE,<br><br>　　　　Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:07-CR-345<br><br>Judge Dee Benson |

　　　　This matter is before the court on Defendant's motion to suppress. On May 2, 2008, the court conducted an evidentiary hearing on the motion. Defendant Harrison Begaye ("Begaye") was present with his counsel, L. Clark Donaldson and Robert Steele. The government was represented by Trina Higgins. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. After review and consideration of the briefs submitted by the parties and the testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

**I. Background**

　　　　The court finds the relevant facts as follows.[1] Begaye and his wife, Rena Begaye ("Rena"), live on the Navaho Reservation south of Bluff, Utah. (Tr. at 8:8-10.) On May 25, 2007, Special Agents Matt Larson ("Larson") and Rachel Boisselle ("Boisselle") of the FBI arrived and knocked on the door of the Begaye residence to talk with the Begayes. (Tr. at 8:1-

---

[1] Reference to the transcript of the evidentiary hearing conducted on May 2, 2008, will be cited as "Tr. at __." Reference to the transcript of the recorded interview on May 25, 2007 will be cited as "Int. Tr. at __."

21.) Larson told the Begayes that they were there to discuss their children's removal from the home. (Tr. at 10:1-2.) Larson indicated that he wanted to talk with Begaye and the two of them walked down the stairs toward a pickup truck. (Tr. at 10:7-17.) Boisselle walked off with Rena toward the horse corrals, approximately 30 to 50 yards from the pickup truck. (Tr. at 10:11-13; 11:15-21.)

Larson was not in uniform, and although he had a firearm, it was not displayed. (Tr. at 15:8-14.) Larson and Begaye stood at the bed of the truck, and began talking. (Tr. at 13:7-9.) Larson started by telling Begaye that he had a digital recorder, and that he was going to record the conversation. (Tr. at 10:18-21.) Larson told Begaye that he didn't have to talk if he didn't want to, and Begaye indicated that he was willing to talk. (Tr. at 10:23-24.)

Larson explained that Begaye's children had been forensically interviewed, and based on the interviews, there may be a need for Begaye to receive counseling. (Int. Tr. at 4.) Larson also said that the children had been examined, and proceeded to ask Begaye about his methods of discipline. (Int. Tr. at 5-7.) Begaye responded by saying that he had used a horse whip to discipline the kids. (Int. Tr. at 6.) Larson asked what kind of injuries the whip left, and Begaye agreed that the whip could leave welts and bruises, but that the whip did not break the skin. (Int. Tr. at 8-9.) Begaye also admitted to using a rope to discipline his children. (Int. Tr. at 9.)

Larson then asked Begaye whether he had shot one of his children in the face with a b.b. gun. (Int. Tr. at 11.) Begaye initially denied it. (Int. Tr. at 11-13.) Larson continued to press Begaye on the issue by telling him that the kids said that Begaye shot one of his boys in the face with a b.b. gun. (Int. Tr. at 13.) Begaye continued to deny shooting the b.b. gun, so Larson moved on by telling him that the examination of the children revealed that they had been poked

with a syringe. (Int. Tr. at 16-17.) Begaye told Larson that he had needles for his horses, but first denied poking any of his children with the needles. (Int. Tr. at 17-19.) Upon further conversing with Larson, Begaye admitted that he often poked one of his sons with a needle to tease him. (Int. Tr. at 19-20.) When told that the other children had needle marks on their bodies, Begaye said that the marks were probably from gnats. (Int. Tr. at 20.) Larson told him that the doctors could tell the difference between bug bites and needle marks, and that these were needle marks. (Tr. at 21.)

Larson proceeded to tell Begaye that a couple of medical examinations had been taken on Begaye's eleven year-old daughter, and there was a concern that she had been sexually abused. (Int. Tr. at 22.) He told Begaye that D.N.A. samples had been taken, in the form of semen, skin, and pubic hair, and that it would be determined who had sex with his daughter. (Int. Tr. at 23.) Larson then asked Begaye whether he thought counseling was necessary, and Begaye said he thought it was. (Int. Tr. at 23.) Larson then asked him how long the sexual abuse had been going on, and after a long pause, Begaye admitted that he had sex with her. (Int. Tr. at 24.) He said he had sex with her once a month for three months. (Int. Tr. at 26.) Because Begaye's daughter had told doctors that it had been going on for longer than that, Larson continued speaking with Begaye about the frequency and extent of the sexual contact. (Tr. at 32:10-15.)

During the interview, which lasted approximately an hour, Larson maintained a conversational tone. (Tr. at 15:2-3; 16:9-11.) Begaye was also calm; he never got emotional or angry. (Tr. at 15:4-7.) There was never any yelling, swearing or threats made. (Tr. at 15-16.) Begaye leaned against his own truck throughout the entire interview, and was never physically restrained. (Tr. at 16:6-8.) Larson never told Begaye at any time before or during the interview

that he was going to be arrested or that he was required to stay there.  (Tr. at 16:16-18.)  Larson testified that he did not go to the Begaye residence with the intention of arresting Begaye.  (Tr. at 33:18-22.)

At the end of the interview Larson spoke with Boisselle about their respective interviews, and how to proceed.  (Tr. at 16:20-24.)  They spent about 45 minutes taking photographs of the home, and collecting some physical evidence, including a b.b. gun, a lead rope, and a whip.  (Tr. at 17-18, 35.)  Larson and Boisselle spoke again, and determined that Begaye should be arrested.  (Tr. at 18:3-11.)  Larson testified that the basis for that determination was that Begaye admitted to having sex with his eleven year-old daughter, and that the agents had found physical evidence to corroborate the children's statements concerning physical abuse.  (Tr. at 18:12-24.)

Boisselle made the final decision to place Begaye in custody.  (Tr. at 19:6-8.)  Begaye was told he was under arrest and he was taken in handcuffs to the San Juan County Jail.  (Tr. at 19-20.)  On the following Tuesday, May 29, 2007, an affidavit was written for a complaint charging Begaye with several crimes.  (Tr. at 19:18-23.)

Five days after his arrest, on May 30, 2007, Begaye was picked up at 6:00 a.m. by Larson and Boiselle and brought to Salt Lake City to appear before a magistrate judge.  (Tr. at 20:6-10.)  It took approximately four and a half hours to drive to Salt Lake City.  (Tr. at 20:11-13.)  Larson used a digital recorder during the drive.  (Tr. at 21:1-7.)  Once Begaye got into the transport vehicle, Larson advised Begaye of his *Miranda* rights.  (Tr. at 22:10-25; 23:1-4.)  Larson told Begaye that he did not have any other questions for him, but that he would answer any questions Begaye had.  (Tr. at 23:5-14.)  Larson explained to Begaye what would be happening that day at

the hearing, and that there would be a defense attorney there when they arrived.  (Tr. at 23:15-18.)

After approximately three and a half hours had passed, Larson asked Begaye if he could ask him a question.  (Tr. at 36:5-7.)  Begaye indicated that that was fine, and Larson asked Begaye again the number of times he had intercourse with his daughter.  (Tr. at 36:18-21.)  Begaye answered consistently with what he had already told Larson, that it happened three times, once a month for the last three months.  (Tr. at 37:1-2.)  Then Larson asked if Begaye had any other questions. (Tr. at 37:8-10.)  Begaye seemed somewhat concerned about what would take place at court that day, and he asked some questions about the charges against him.  (Tr. at 37-38.)  Furthermore, he asked Larson about the attorney appointed to represent him.  (Tr. at 37-38.)

Begaye was charged with: (1) knowingly causing his child under the age of 12 years old to engage in a sexual act by using force against her, and attempted to do so, in violation of 18 U.S.C. § 2241(a)(1) and § 1153(a); (2) knowingly assaulting his son with a dangerous weapon, a b.b. gun, causing serious bodily injury, in violation of 18 U.S.C. § 113(a)(3) and § 1153(a); and (3) knowingly assaulting his son with a dangerous weapon, a b.b. gun, causing serious bodily injury, in violation of 18 U.S.C. § 113(a)(3) and § 1153(a).  Begaye filed a motion to suppress the statements he made on May 25 and May 30, 2007, based on the grounds that the statement taken on May 25, 2007 was taken in violation of the Fifth Amendment to the United States Constitution, and the statement taken on May 30, 2007 was taken in violation of the Fifth and Sixth Amendments to the United States Constitution.

## II. Discussion

The government does not intend on introducing Begaye's statement made on May 30, 2007. *See* Memo. In Opp., 1. Therefore, the court will only address the admissibility of the statements made on May 25, 2007.

The Fifth Amendment to the United States Constitution provides a privilege against self-incrimination. "[N]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. At the time *Escobedo v. State of Illinois,* 378 U.S. 478 (1964), and *Miranda v. Arizona,* 384 U.S. 436 (1966), were decided, the Supreme Court was concerned with law enforcement's intrusive interrogation practices. *Escobedo* involved a defendant, who while in custody at a police station and handcuffed, was questioned for four hours until he confessed to a murder. 378 U.S. at 480-82. Similarly, *Miranda* comprised four separate cases, each involving a defendant who was taken into custody and interrogated for an extensive period of time in order to obtain a confession. 384 U.S. at 456-57. The Court outlined some of the in-custody police interrogation procedures found in police manuals, and discussed the coercive nature of these practices, which include isolating the suspect in an unfamiliar surrounding for an extensive period to further a confession. *Id.* at 448-53. Although *Escobedo* involved the Sixth Amendment right to counsel, it was against this backdrop that the United States Supreme Court imposed a protective device in *Miranda v. Arizona* to ensure that confessions are not made that are offensive to the Fifth Amendment privilege against self-incrimination.

Pursuant and subsequent to *Miranda*, any confession obtained during a "custodial interrogation" may not be used by the prosecution against the defendant unless the prosecution demonstrates the use of these procedural safeguards. *Id.* at 444. Prior to questioning, the person

being interrogated must be warned of his *Miranda* rights, including the right to remain silent. *Id.* *Miranda* rights need only be given to a suspect when the suspect is "in custody" and the questioning meets the legal definition of "interrogation."

Requiring that *Miranda* warnings be given to a suspect "in custody" includes situations when a person, although not necessarily questioned at a police station, is questioned in a coercive, police dominated atmosphere. For example, in *Orozco v. Texas,* 394 U.S. 324 (1969), police officers arrived at the defendant's home at 4:00 a.m., placed him under arrest, and questioned him about a shooting that had occurred that night. *Id.* at 325-26. The defendant admitted to owning the gun. *Id.* The Supreme Court found that the defendant was "in custody" for *Miranda* purposes, and law enforcement should have provided the defendant with his *Miranda* rights. *Id.* at 326-27.

A "custodial interrogation" occurring outside of a police station is, however, not limited to when a defendant is arrested. It may occur in the absence of an arrest if the facts indicate that coercion is present. The court in *United States v. Beraun-Panez*, 812 F.2d 578 (9th Cir. 1987), a case which Defendant cites, found that the defendant was in custody when he was questioned in an open field because the atmosphere was police dominated. *Id.* at 581-82. Two officers called to the defendant, who was riding on horseback, to come speak with them. *Id.* The defendant approached them and was immediately interrogated about whether he had started a fire. *Id.* Throughout the questioning, which lasted between half an hour and an hour and a half, the defendant was positioned between the officers. *Id.* The conversation was confrontational, and the officers threatened the defendant that if he lied to them, he would be deported. *Id.* The defendant finally admitted to starting the fire. *Id.* The Ninth Circuit affirmed the district court's

7

finding that the statement be suppressed. *Id.* at 582. Although the defendant was not arrested during the interrogation, the defendant was isolated in a remote part of Idaho and the court found that the questioning occurred in a police dominated atmosphere. *Id.* at 581-82.

An individual is "in custody" for purposes of *Miranda* if he is "deprived of his freedom of action in any significant way." 384 U.S. at 444. To determine if a person was in custody, the court must assess whether "a reasonable [person] in the suspect's position would have understood [the] situation . . . as the functional equivalent of formal arrest." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). Determining whether a person was in custody is "fact intensive" and must be evaluated based on the "totality of the circumstances." *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir. 1993). Helpful to that analysis is whether the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will. *Id.* The nature of the questioning, whether accusatory or conversational, is to be considered. *Id.* The court must also analyze whether the environment was "police dominated." *Id.* Indications of whether police are in control may include whether the suspect was separated from his family and isolated in a private questioning room, whether there was the presence of several officers, whether there was a display of weapons, and whether the officer's language and tone indicated that compliance might be compelled. *Id.* at 1518-19.

Based on the court's analysis of the foregoing factors, the court finds that unlike the factual scenarios presented in *Miranda* and *Orozco* where the defendants were clearly in custody and facing the threat of coercion, the facts here do not support a finding that Begaye was in custody. *Beraun-Panez* is also easily distinguishable because in that case, the defendant was positioned between two officers, and was threatened in a confrontational tone that if he did not

tell the truth, he would be deported.  The police dominated atmosphere in *Beraun-Panez* is not present here.  Begaye was questioned in front of his own home.  When Begaye was approached by Larson, he knew the subject matter Larson had come to talk to him about.  Significantly, Begaye was told that he did not have to talk to the agent if he did not want to and Begaye clearly communicated to the agent that he was willing to talk.  The interview lasted less than an hour.  Begaye was not handcuffed, nor was he under any kind of physical restraint.  The recording of the interview between Larson and Begaye reveals that despite the sensitivity of the matters being discussed, the discussion was conversational in nature.  Larson made several comments to create an environment of understanding and cooperation, rather than one of coercion.  Finally, the atmosphere was not police-dominated.  The interview took place outside by Begaye's pickup truck, and Begaye's wife was within 50 yards of him during the interview.  He was not isolated or in an enclosed room.  There was only one agent, Larson, questioning him.  Larson was in casual clothing and he never displayed his firearm.  All of these facts show that Begaye was not threatened by Larson or coerced to speak against his will during the interview.

The court finds that a reasonable person being questioned in Begaye's position would not understand that the interview was "the functional equivalent of formal arrest."  *Berkemer,* 468 U.S. at 442.  Under the totality of the circumstances, the facts do not support that Begaye was in custody for *Miranda* purposes.  Therefore, the statements made by Begaye during the May 25, 2007 interview are admissible.  Defendant's motion to suppress is DENIED.

IT IS SO ORDERED.

DATED this 1st day of August, 2008.

_____
Dee Benson
United States District Judge